**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KELLY RENEE PRESTON,

       *Plaintiff*,

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

       *Defendant.*

_____/

CASE NO. 2:18-12248

DISTRICT JUDGE GERSHWIN A. DRAIN

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
(R. 13, 14)

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 13), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (R. 14), be **DENIED**, and this case be **REMANDED** for further proceedings.

## II. REPORT

### A. Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Kelly Renee Preston's claims for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.*, and for Supplemental Security Income (SSI) under Title XVI, 42 U.S.C. §§ 1381-1383f. (R. 1). Pursuant to 28 U.S.C. §

1

636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (R. 3). Currently before the court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 13, 14). Plaintiff has also filed a response to Defendant's motion. (R. 16).

Plaintiff filed her application for DIB on November 18, 2015,[1] alleging onset on December 5, 2014, (R. 9 at PageID.239-40); she filed for SSI on December 1, 2015, (R. 9 at PageID.241-46). Her claims were denied at the initial level on March 17, 2016. (*Id.* at PageID.125-26). After an administrative hearing was held at Plaintiff's request, (*id.* at PageID.60-99), Administrative Law Judge (ALJ) Terry Michael Banks issued a decision finding that Plaintiff had not been under a disability from her alleged onset date through the date of the decision, December 21, 2017. (*Id.* at PageID.34-59). The Appeals Council denied Plaintiff's request for review. (*Id.* at PageID.28-33). This action followed. (R. 1).

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks

---

[1] The ALJ stated that Plaintiff filed her applications on November 17, 2015. (R. 9 at PageID.42). Neither party has expressed any concern about this discrepancy, and I cannot see how it would affect the outcome, as the ALJ found that Plaintiff was not under a disability between her alleged onset date, December 5, 2014, and the date of the decision, December 21, 2017. (*Id.* at PageID.54).

2

omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

## C. Framework for Disability Determinations

Under the Social Security Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42

4

U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been under a disability from the alleged onset date, December 5, 2014, through the date of the decision, December 21, 2017. (R. 9 at PageID.54). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (*Id.* at PageID.44). Next, the ALJ determined Plaintiff had the following severe impairments: tibial tendinitis, depression, and anxiety. (*Id.* at PageID.44-45). In addition, Plaintiff had the following non-severe impairments: obesity, pneumonia, obstructive sleep apnea, trichotillomania, vertigo, and left posterior tibial tendinitis/synovitis. (*Id.*). The ALJ found the record "devoid of evidence," however, "to establish the claimant has the impairments of fibromyalgia, COPD/asthma/bronchitis, and right shoulder pain." (*Id.* at PageID.45). And Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.* at PageID.45-48).

Before proceeding further, the ALJ found Plaintiff had the RFC to perform medium work, as defined in 20 C.F.R. § 404.1567(c) and 416.967(c), except that

> with respect to understanding, remembering, and carrying out instructions, she is limited to performing simple and routine tasks; with respect to the use of judgment, she is limited to simple work-related decisions; and there should be no more than occasional changes in the workplace setting, and any changes should be well explained in advance.

(*Id.* at PageID.48).

At steps four and five, the ALJ concluded that Plaintiff could perform her past relevant work as an assembler and as an inspector. (*Id.* at PageID.52-53). In the alternative, the ALJ found that other jobs that Plaintiff could perform existed in significant numbers in the national economy. (*Id.*). Thus, the ALJ determined that Plaintiff had not been under a disability as defined in the Social Security Act during the relevant time. (*Id.* at PageID.54).

### E. Administrative Record

#### 1. Medical Evidence

I have thoroughly reviewed the medical record, and will refer to it as necessary in my analysis below.

#### 2. Application Reports and Administrative Hearing

##### i. Plaintiff's Function Report

Plaintiff completed a function report on December 21, 2015. (R. 9 at PageID.276-83). She explained that her anxiety and depression made it hard to be around people, leave her house, and stay focused. (*Id.* at PageID.276). Her illnesses caused vertigo, panic attacks, and excessive sleep. (*Id.*). She did not rouse easily, "[did] not hear alarms," and took "a lot of naps." (*Id.* at PageID.276-77). She also had difficulty sitting for long periods of time, and "permanent lifting restrictions" from a work-related shoulder injury. (*Id.* at PageID.276). Further, she explained, she had a lot of pain that made it hard to cope or stay

6

focused. (*Id.*). She struggled to get places on time and remember things, and had to use a calendar in her phone to set reminders. (*Id.*).

On a typical day, Plaintiff would take the kids to school, go to appointments, do chores around the house, attend online classes, and take long naps. (*Id.* at PageID.277). She took care of her children by cooking and cleaning for them, and driving them around. (*Id.*). Her children helped with chores around the house. (*Id.*). Plaintiff also took care of a pet, providing her food, water, and treats, and letting her outside. (*Id.*). In the past, Plaintiff had been "able to keep a job and function," and had not had lifting restrictions. (*Id.*).

When it came to personal care, Plaintiff usually stayed in pajamas, did not take as many showers as she used to or shave very often, and generally lacked energy and slept "a lot more." (*Id.*). She also ate less, because she was often nauseated, and had "diarrhea and constipation issues." (*Id.*). In addition, she kept her hair short "due to pulling my hair." (*Id.*).

For food, Plaintiff prepared frozen dinners or simple meals because of fatigue; her son had had to start helping with the cooking. (*Id.* at PageID.278). Around the house, Plaintiff did the cleaning, laundry and dishes, though it took "a while" because she needed breaks or sleep. (*Id.*). Her children helped with some chores, including with lifting and reaching things, and reminded her to do laundry. (*Id.*). Plaintiff did not do yard work because she was allergic to grass. (*Id.* at PageID.279).

She took the kids to school every day and was able to drive and go out alone. (*Id.*). She shopped two or three times a month for food and household necessities, either in store or online, and went "during later hours to avoid people and get out quicker." (*Id.*). She did

not like being around a lot of people or leaving her house. (*Id.* at PageID.280). And although she usually got along well with authority figures, she occasionally had problems getting along with others due to her anxiety or depression. (*Id.* at PageID.281, 282). She used to visit family and friends more often and participate in her kids' school activities. (*Id.* at PageID.281).

For hobbies, Plaintiff enjoyed drawing, crochet, watching television, and listening to music; she now did them "not as often due to fatigue and lack of interest." (*Id.* at PageID.280). She spent time with her kids every day, and talked to others on the phone or computer. (*Id.*).

She indicated that her impairments affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, and get along with others, as well as her memory and concentration. (*Id.* at PageID.281). She estimated she could lift 5 pounds consistently and up to 20 pounds occasionally. (*Id.*). Pain, poor balance, and vertigo had tempered her endurance. (*Id.*). She was not sure how long she could walk, and found it varied how long she could walk before needing to rest for a few minutes. (*Id.*). She struggled to pay attention to things that did not keep her interest. (*Id.*). She followed written instructions "pretty well," but spoken instructions "not as well." (*Id.*). She did not handle either stress or changes in routine very well. (*Id.* at PageID.282). She had noticed fears of being around people, leaving the house, not waking up, and missing appointments or assignments. (*Id.*).

Plaintiff's Xanax, Lyrica, Cymbalta, Buspirone, and Promethazine caused drowsiness, and her Lyrica and Brintellix caused dizziness. (*Id.* at PageID.283). Plaintiff

also wore glasses and had used crutches or a brace as needed since December 2007. (*Id.* at PageID.282).

In closing, she said: "I recently started going to U of M cancer center due to illnesses and blood results. I will also be seeing a specialist at U of M in March 2016 for my ankle and needed surgery," which physical therapy could not fix. (*Id.* at PageID.283). Because her counselor had left for a new job, Plaintiff needed to find a new counselor. (*Id.*). Her nausea had also worsened in the past couple of months, and kept her from going places "due to vomiting or feeling like I'm going to vomit." (*Id.*).

## ii. Third-Party Function Report

Plaintiff's mother, Cynthia Preston, completed a function report that largely echoed Plaintiff's. (R. 9 at PageID.289-96). She agreed that Plaintiff's pain and fatigue limited her ability to work. (*Id.* at PageID.289). She corroborated that Plaintiff spent her days taking online classes and taking care of the children by cooking and doing household chores. (*Id.* at PageID.290). Plaintiff also took care of a pet. (*Id.*). Plaintiff's mother indicated that she had no problem with personal care and had had no change in her cooking habits since onset. (*Id.* at PageID.291). Further, Plaintiff was able to do cleaning, laundry, and yardwork without help or encouragement. (*Id.*). She shopped in stores or by computer for food on a weekly basis, could leave the house by herself, and could drive. (*Id.* at PageID.292). For hobbies, Plaintiff enjoyed drawing and crocheting, which she did well, though she "has less time because of fatigue." (*Id.* at PageID.293).

Plaintiff's mother had not noticed that she had issues getting along with others, and she got along "pretty well" with authority figures, but she did not like to go in stores if a

lot of people were inside. (*Id.* at PageID.294-95). Her mother indicated that Plaintiff's shoulder injury, dizziness, and nausea affected her abilities to lift, bend, and kneel. (*Id.*). Plaintiff's mother was unsure how far she could walk, but thought she could pay attention indefinitely, finish what she started, and follow both written and spoken instructions well. (*Id.*).

According to Plaintiff's mother, she had been "pointed out [*sic*] from missing work from anxiety and vertigo." (*Id.* at PageID.295). Her mother confirmed that she did not handle stress or changes in routine well. (*Id.*). Further, her mother had noticed she was sleeping a lot; Plaintiff sometimes needed to be reminded to go places if she was sleeping. (*Id.* at PageID.293, 295). Lastly, her mother noted that Plaintiff had been prescribed a brace and crutches by an emergency room physician several years earlier, which she used occasionally. (*Id.* at PageID.295). And, like Plaintiff, she reported that several of Plaintiff's medications caused drowsiness and dizziness. (*Id.* at PageID.296).

### iii.  Plaintiff's Testimony at the Hearing

A hearing was held in Plaintiff's case on August 21, 2017, and Plaintiff testified. (R. 9 at PageID.60-99). Plaintiff testified that she was living with her three children, who were about 7, 12, and 18 years old. (*Id.* at PageID.66-67). She had a driver's license and drove regularly. (*Id.* at PageID.67).

Plaintiff had finished the twelfth grade. (*Id.*). She had last worked in September 2015, for Murphy USA gas station, where she had been a cashier for about a month and a half. (*Id.* at PageID.67-68, 72). Previously, she had worked on an assembly line at L&W Engineering. (*Id.* at PageID.68). There, she had had to lift up to 10 pounds. (*Id.*). L&W had

fired her when she reached 8 points on their point system because she had missed 2 days going to the doctor or emergency room for severe vertigo, and she had missed 12 half-days. (*Id.* at PageID.74-75).

Plaintiff had also worked part-time for Wal-Mart from 2012 to 2014. (*Id.*). She had been self-employed from 2007 to 2011, though in 2009 and 2010 she had delivered newspapers for the Daily Telegram, where she had lifted at most 10 pounds. (*Id.* at PageID.69). From 2004 to 2007, she had worked for Hi-Lex Controls, assembling car parts. (*Id.*). She had lifted pallets that weighed 25 pounds, and she had injured her shoulder lifting a pallet to put on a shelf. (*Id.*). In 2004, for about four months she had worked for Kelly Services, where she inspected windshields made at the factory "and add[ed] like solder clips and other things to them." (*Id.* at PageID.70). By Plaintiff's estimate, she had to lift at least 20 pounds at that job. (*Id.*). Before that, in 2003, she had worked for about six months for the Lenawee Stamping Corp, doing auto parts assembly, lifting 20 to 25 pounds. (*Id.*). In 2002, she had worked at Ajilon, and prior to that at Tecumseh Products, doing assembly of refrigeration components, with minimal lifting required. (*Id.* at PageID.71).

Plaintiff explained that she had left Murphy Oil because she was having problems bending over and lifting crates of drinks to restock the coolers, and because the manager "had a day where she came across towards me rather rude and disrespectful," angering Plaintiff, so she quit. (*Id.* at PageID.72). After that, Plaintiff looked for work, but said she was stymied because "during that day . . . I don't hear, like, alarms or phone ringing or anything when I'm sleeping." (*Id.*). She had slept through a couple of interviews. (*Id.* at PageID.73). Some positions were unsuitable because they required her to start in the

11

morning. (*Id.*). And, she added, she was "having a lot of problems with bending over and standing for too long or sitting." (*Id.*). She had stopped looking for work after applying for disability benefits. (*Id.* at PageID.73-74).

Plaintiff's children usually woke her so that she could take them to school, but in the past couple of years, there had been days where they couldn't wake her, and their grandfather had to take them to school instead. (*Id.* at PageID.72-73).

She had trouble waking up, she said, because of obstructive sleep apnea and narcolepsy. (*Id.* at PageID.73). She had been diagnosed after a nap study in July, but said, "I believe they only sent her the results from my first sleep study where they diagnosed the sleep apnea." (*Id.*). She used a CPAP machine every night for her sleep apnea. (*Id.* at PageID.89). Before she had begun taking Adderall, she would nap for four hours a day on top of sleeping 9 to 12 hours per night. (*Id.* at PageID.87-88). With the Adderall, however, she did not need to nap anymore during the day. (*Id.* at PageID.88). In a typical day, she would sleep 11 to 12 hours, but sometimes as few as 9. (*Id.*).

In Plaintiff's view, the physical problems that kept her from working were her back, hip, arthritis in her neck, and permanent work restrictions from her shoulder injury. (*Id.* at PageID.75). The surgeon had limited her to occasionally lifting 20 pounds and frequently lifting 5 pounds. (*Id.*). She had injured her shoulder in 2005 and had surgery in August 2006; she had not had treatment for her shoulder since 2015. (*Id.* at PageID.75-76). She explained, "[S]he told me no over shoulder lifting because that's how I got the impingement. He went in and ground off a good chunk of bone in my shoulders." (*Id.* at

PageID.76). Then after surgery and physical therapy, she had undergone a functional capacity examination. (*Id.*). She did not discuss the results of the examination.

She said, however, that if she lifted too much with the right shoulder, she could get migraines. (*Id.*). When she went to the chiropractor, "they made some diagnosis like the arthritis, when I would go in for adjustments, it was causing me to have migraines on a daily basis." (*Id.* at PageID.76-77). So she had stopped going. (*Id.* at PageID.77). She had previously gone to see a chiropractor three times a week for her right hip, after she rolled her car in 2003. (*Id.*). For the migraines, she took Norco, or sometimes could "get by with just some Ibuprofen 800." (*Id.*). She got migraines about eight days a month. (*Id.* at PageID.78). Her primary care physician, Shawn Gerrity, had also recently prescribed an arthritis medication to help with the pain; she had previously taken muscle relaxers but had a bad reaction. (*Id.*).

Plaintiff also testified that she had problems with her knees, mostly her right, so she had a hard time squatting and rising from a squat. (*Id.* at PageID.79). And her left ankle was still "severely pronated," even after surgery to keep her from rolling her ankle as often. (*Id.*). The angle of her ankle caused pain and swelling in the ankle and on the bottom of her foot, and if she stepped "just right," she got shooting pains. (*Id.*). Further, Plaintiff had had scoliosis since she was born, which caused her upper body to tilt to the right. (*Id.* at PageID.80). The chiropractor had told her she had arthritis in her back, and x-rays from when she was hospitalized for pneumonia had showed degenerating discs in her upper back. (*Id.*).

13

In addition, Plaintiff had some problems with her hands and wrists. (*Id.* at PageID.84). In her left wrist, she had a partial tear in a ligament; she had been referred to a hand surgeon and had an appointment coming up in October. (*Id.*). Sometimes, too, her hands would cramp up so badly she could not use them. (*Id.*).

Moving on to her emotional issues, Plaintiff testified that she had severe anxiety that sent her into panic attacks, for which she took Xanax; depression, which was "currently under control"; and bipolar disorder. (*Id.* at PageID.80). She was treating with a psychiatrist at CMH, and they were adjusting her medication dosage because she still had "a lot of anger issues." (*Id.* at PageID.80-81). During physical therapy for her vertigo, she had been told that her stress and anxiety caused her vertigo; when she was upset, she got light-headed and dizzy. (*Id.* at PageID.81).

Plaintiff had panic attacks about three days a week, triggered by feeling overwhelmed or by changes on short notice—for example, if her parents came to her house to "last minute say, let's go do this, we didn't plan on it"—or by being asked to make decisions on the spot. (*Id.* at PageID.81-82). Her panic attacks lasted half an hour to an hour, depending on how long it took the Xanax to work. (*Id.* at PageID.82). During panic attacks, she felt "overwhelmed," light-headed, dizzy, and nauseous, and could hyperventilate. (*Id.*). She also sometimes got pains in her left side. (*Id.*).

Plaintiff said she had also been having problems with her memory, so she put all her appointments in the calendar on her phone with reminders. (*Id.* at PageID.82). She had noticed that while doing a class online, she could not "sit for very long and look at the

screen and read a lot"; she had to take breaks. (*Id.* at PageID.86). And she would forget things her children had told her the day before. (*Id.*).

Plaintiff estimated she could sit or stand for about half an hour at a time before needing to switch. (*Id.* at PageID.83). She could walk three or four blocks before pain set in. (*Id.*). And she could carry 5 to 10 pounds. (*Id.* at PageID.84). If she walked too far or too fast, she needed to use an inhaler. (*Id.* at PageID.89). She found reaching overhead with the right arm "a little more challenging," though she could if she moved slowly. (*Id.* at PageID.85). She had been advised not to lift with the right shoulder, though, because that had caused the past impingement in her shoulder. (*Id.*). She could reach and pick up something she had dropped on the floor, but it would hurt her back. (*Id.*). If she was sitting in a chair, however, she could reach forward and pick up a coffee cup. (*Id.*).

On a typical day, with medication, her pain was about a 7 out of 10. (*Id.* at PageID.84). Although most days were bad, she guessed about 8 to 10 a month were more severe. (*Id.* at PageID.87). Her medications caused side effects, including severe stomach pains and cramps that sent her "in and out of the bathroom," light-headedness, dizziness, and nausea if she did not eat when she took them. (*Id.* at PageID.86). She thought her struggle with her memory could also be a side effect of her medications. (*Id.*).

Plaintiff had been working on quitting smoking. (*Id.* at PageID.89). Though she usually smoked a pack a day, she had instead been using an e-cigarette approved by a breathing specialist and wearing patches. (*Id.* at PageID.89-90). For about a month prior to the hearing, she had not smoked, but she had smoked in the days before the hearing because of stress. (*Id.* at PageID.90).

### iv.  The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) James Fuller also testified. (*Id.* at PageID.90). The VE classified Plaintiff's past jobs as assembler (unskilled, classified as light, performed at light and medium); newspaper delivery (unskilled, light); and inspector (unskilled, light). (*Id.* at PageID.92). The ALJ then posed his first hypothetical, asking the VE to assume a hypothetical person who can perform "a full range of medium work except she can frequently push and pull with her lower left extremity. She can occasionally climb ramps and stairs. She can occasionally climb ladders, ropes or scaffolds. She can frequently stoop, crouch and kneel." (*Id.* at PageID.92-93). The VE answered that the hypothetical person could perform Plaintiff's work both as she actually performed it and as the work is generally performed. (*Id.* at PageID.93). The person could also work as a dishwasher, in packaging jobs, or in laundry work. (*Id.*).

For the second hypothetical, the ALJ added additional restrictions:

with respect to understanding, remembering and carrying out instructions, she is limited to performing simple and routine tasks. With respect to the use of judgment, she is limited to simple work-related decisions. There should be no more than occasional changes in the workplace setting. And any changes should be explained in advance.

(*Id.* at PageID.94). That person, the VE testified, would be able to perform Plaintiff's past work as an inspector or assembler, but not as a newspaper delivery person. (*Id.*). She could also work in the three jobs previously listed—dishwasher, packager, and laundry worker. (*Id.*).

Moving on to the third hypothetical, the ALJ included all the restrictions from the first hypothetical, but also a limitation to light work. (*Id.*). The assembly job and inspector

16

job would be available as generally performed. (*Id.* at PageID.94-95). The person could also work in packaging jobs (185,000 positions); sorting jobs (220,000 positions); and laundry work (120,000 positions). (*Id.* at PageID.95).

In the fourth hypothetical, the ALJ returned to all the limitations at hypothetical two, except at the light exertional level. (*Id.*). The assembly job and inspector jobs would remain available as generally performed, as would packaging jobs (185,000 positions); sorting jobs (220,000 positions); and laundry work (120,000 positions). (*Id.* at PageiD.94-95).

Next, the ALJ returned to the first hypothetical, but added a limitation to work at the sedentary level. (*Id.* at PageID.95). Plaintiff's past work would be excluded, the VE said, but the person could work in sorting jobs (35,000 positions); inspection jobs (40,000 positions); and assembly jobs (90,000 positions). (*Id.* at PageID.95-96). The same three jobs would be available with the addition of the mental limitations outlined above. (*Id.* at PageID.96).

Ordinary breaks would be 15 minutes in the morning, 15 minutes in the afternoon, and a 30 minute lunch over the course of a 9-hour workday. (*Id.*). The ordinary tolerance for absenteeism was one day per month, and a worker could be off-task a maximum of 10 percent of time. (*Id.*).

Lastly, the VE confirmed that his testimony was consistent with the Dictionary of Occupational Titles and the Selected Characteristics of Occupations, except for his testimony about breaks, absence liability, and the on-task requirement, which were based upon his professional experience as a vocational rehabilitation counselor. (*Id.*).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017).[2] "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such

---

[2] SSR 06-03p was rescinded effective March 27, 2017, and 20 C.F.R. § 404.1513 was updated as of March 27, 2017. The new regulation is effective for cases filed on or after March 27, 2017; because Plaintiff filed for benefits in 2015, I consider her case under the old rule.

as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility

determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); 16-3p, 2016 WL 1119029, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

    (i)      [D]aily activities;
    (ii)     The location, duration, frequency, and intensity of . . . pain;
    (iii)    Precipitating and aggravating factors;
    (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)     Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); 16-3p, 2016 WL 1119029, at *7.

### G. Analysis

Plaintiff argues the ALJ's decision cannot stand because the ALJ failed to account for Plaintiff's (1) difficulty being around others; (2) expected absences from work; and (3) left ankle impairment. (R. 13).

### 1. Whether Substantial Evidence Supports Plaintiff's RFC

#### i. Plaintiff's Difficulty Being Around Others

First, Plaintiff argues that her RFC should have included limitations to reflect her difficulty being around others. (R. 13 at PageID.863). As evidence of her limitations, she points to records from Dr. Tejero and therapist Donna Bishop, and her mother's statement that Plaintiff "had difficulty being around a lot of people." (*Id.* at PageID.865).[3]

Defendant responds that Plaintiff "is wrong that the ALJ did not include any social limitations," because simple, routine work "relate[s] to working with things (rather than with data or people)." (R. 15 at PageID.878) (citing 20 C.F.R. § 404, Subpt. P, App'x 2 §

---

[3] Further, she faults the ALJ for saying that Plaintiff "spends time with others" because "she actually does so on the phone or on the computer rather than in person." (R. 13 at PageID.864) (citing R. 9 at PageID.280). But on the cited page, Plaintiff actually wrote that she spends time with "my kids. Talk to others usually on phone or computer." (R. 9 at PageID.280). The ALJ did not uncharitably mischaracterize Plaintiff's statements (the only quibble I might have is that he seems to have misunderstood her to "talk[] on the phone with her kids," rather than live with them). In fact, in the same breath as his note that she "spends time with others," he also recognized that she "has problems getting along with friends, family and neighbors, 'due to her anxiety and depression.'" (*Id.*). I do not see any significant error in his phrasing.

22

201.00(i)). Although the regulations state that unskilled work "relate[s] to working with things (rather than with data or people)," 20 C.F.R. § 404, Subpt. P, App'x 2 § 201.00(i)), it is also true that "[t]he basic demands of competitive, remunerative, unskilled work include the abilit[y] (on a sustained basis) . . . to respond appropriately to supervision [and] coworkers," SSR 85-15, 1985 WL 56857 at *4 (Jan. 1, 1985). I would not find that a limitation to "unskilled work," alone, necessarily accounts for deficits in social functioning. *See Marion v. Comm'r of Soc. Sec.*, No. 4:16-cv-11198, 2017 WL 1833122, at *2 (E.D. Mich. May 8, 2017) (finding a limitation to unskilled work did not address documented deficits in interacting with others in the workplace).

The question, then, is whether substantial evidence supports the ALJ's decision not to include limitations on contact with people in Plaintiff's RFC. Defendant observes that it is Plaintiff's burden to demonstrate a more restrictive RFC is needed, and argues she has not carried that burden. (*Id.* at PageID.879) (citing *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) (claimant bears burden of demonstrating need for a more restrictive RFC)). Further, Defendant says, Dr. Marshall's opinion backed the ALJ's, as Dr. Marshall had found that Plaintiff had only mild limitations in her ability to interact with others. (R. 19 at PageID.119).[4] The consultative examiner and all other sources who treated

---

[4] Defendant argues that Dr. Marshall's opinion supports the ALJs, but as Plaintiff observes, the ALJ gave little weight to Dr. Marshall's opinion that Plaintiff "has a mild restriction in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation." (R. 9 at PageID.51). The ALJ explained that Dr. Marshall's opinion deserved little weight because "the medical evidence of record establishes that the claimant has severe mental impairments." (*Id.*). At step three, however, the ALJ had spelled out the exact same conclusions from the same physician but given them "*some* weight," finding

Plaintiff found her cooperative, (R. 14 at PageID.881) (citing R. 9 at PageID.508-511, 520,

546, 563, 573, 577, 582, 586, 590). And the parts of Dr. Tejero's notes that Plaintiff points

to as evidence of "social problems" are "based on her subjective complaints to the doctor,

nothing more." (R. 14 at PageID.881) (citing *McCready v. Comm'r of Soc. Sec.*, No. 10-

13893, 2012 WL 1060088, at * (E.D. Mich. Mar. 2, 2012) (observations in "history of

present illness" section "are merely the narrative description of plaintiff's subjective

complaints and symptoms and are not opinions regarding plaintiff's limitations or

restrictions"), *Rep. & Rec. adopted*, 2012 WL 1056947 (E.D. Mich. Mar. 29, 2012)). As

---

them "generally consistent with this medical record as a whole." (*Id.* at PageID.47)
(emphasis added). I do not see how both can be true.

Defendant attempts to explain that the ALJ gave "some weight" to Dr. Marshall's
opinion as to the paragraph B criteria, and gave "little weight" only to Dr. Marshall's
"overall opinion that plaintiff's mental impairments were not severe." (R. 14 at
PageID.880, n. 3). Though that may well have been the ALJ's intent, it is not apparent from
the text. Rather, the ALJ spelled out the exact same four conclusions on both occasions,
before assigning "this opinion" two different weights. *Compare* R. 9 at PageID.49, *with id.*
at PageID.51). "Findings of fact made by State agency medical and psychological
consultants . . . regarding the nature and severity of an individual's impairment(s) must be
treated as expert opinion evidence of nonexamining sources" at the ALJ level. SSR 96-6p,
1996 WL 374180, at *1 (S.S.A. July 2, 1996). ALJs "may not ignore these opinions and
must explain the weight given to these opinions on their decisions." The ALJ here failed
to explain the weight given to Dr. Marshall's opinion in a way that allows the reviewing
court to follow his reasoning. *See* SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006).

Because Plaintiff does not allege this error caused her any harm, I would not suggest
this contradiction alone warrants remand. But I do not rely on Dr. Marshall's opinion in
my analysis in this section, and if the court chooses to remand the case for the reason I
explain below, I suggest the ALJ should clearly explain to what extent he credited Dr.
Marshall's opinion.

for the opinions of Ms. Bishop and Plaintiff's mother, Defendant says "neither necessarily precludes the very limited social demands of unskilled work." (R. 14 at PageID.882).[5]

In my view, whether the record supports the lack of social limitations is an evidentiary close call. In Plaintiff's function report, she explained that her anxiety and depression made it hard to be around people, (*id.* at PageID.276), and reported that she did not like being around "a lot of people," (*id.* at PageID.280). She "occasionally" had problems getting along with family, friends, neighbors, or others due to anxiety and depression, (*id.* at PageID.281), and had noticed a fear of being around others, (*id.* at PageID.282). But she usually got along well with authority figures, she spent time with her kids every day, and she talked to others on the phone or computer. (*Id.* at PageID.280, 282). She took the kids to school every day and was able to drive and go out alone. (*Id.* at PageID.279). She shopped two or three times a month for food and household necessities, either in store or online, and would "usually go during later hours to avoid people and get out quicker." (*Id.*).

Plaintiff's mother saw her often, usually for shopping. (*Id.* at PageID.289). Her mother noted that Plaintiff did not like to go in stores if a lot of people were inside, but had

---

[5] Defendant also finds it "significant that neither [Plaintiff] nor her representative asked the vocational expert (VE) any hypothetical questions that included further social restrictions." (R. 14 at PageID.885). Defendant makes the novel argument that Plaintiff's failure to do so "significantly weakens—if not precludes—her appeal," citing *Zorn v. Comm'r of Soc. Sec.*, No. 12-13822, 2015 WL 5545257, at *4 (E.D. Mich. Sept. 18, 2015). In *Zorn*, the court found that the claimant, by declining to cross-examine the VE, waived any objections based on inaccuracies in the VE's testimony or conflicts with the DOT. I am not convinced this is an analogous situation—Plaintiff takes issue not with any part of the VE's testimony, but with the ALJ's RFC formulation. I therefore would not base my decision on Plaintiff's failure to inquire about social restrictions on cross-examination of the VE.

not seen her have any problems getting along with family, friends, neighbors, or others, and thought she got along "pretty well" with authority figures. (*Id.* at PageID.294-95).

To Ms. Bishop, Plaintiff reported irritability, (*id.* at PageID.764, 767, 768), feeling isolated, (*id.* at PageID.764, 766, 768, 769), and having relationship issues with others, (*id.* at PageID.765, 766, 767, 768), and once mentioned her unease in public places, (*id.* at PageID.769).

Similarly, Dr. Tejero noted that she had reported irritability at most appointments, (*id.* at PageID.568 ("become[s] angry easily"), 576 ("For the last 2 months, she has been irritable, easy to anger and impulsive."), 589 ("reports anger and irritability, no aggression"); at her most recent appointment with him, however, she said she had not been as irritable and quick to anger lately. (*Id.* at PageID.572). *Cf.* (*Id.* at PageID.585) ("No anger, irritability or aggression."). To Lenawee Community Mental Health staff member Jeff Riggs, Plaintiff also commented, "I have always been a people person so it is hard being around a lot of people now." (R. 9 at PageID.562).

At her evaluation with consultative examiner Gayle Oliver-Brannon, Plaintiff said she did not "like to go out into the community." (*Id.* at PageID.546). But she also said she had some supportive family members, her children, and a good friend. (*Id.*). Leisure time was spent with her children. (*Id.* at PageID.547).

Additionally, Plaintiff testified that she had quit her job at Murphy Oil, at least in part, because the manager "had a day where she came across towards me rather rude and disrespectful," angering Plaintiff. (*Id.* at PageID.72). Asked what triggered her panic attacks, though, Plaintiff said feeling overwhelmed and changes on short notice, not

spending time with others. (*Id.* at PageID.81-82). The ALJ accounted for those triggers with the RFC limitation to "no more than occasional changes in the workplace setting, and any changes should be well explained in advance." (*Id.* at PageID.48).

Lastly, as Defendant noted, treatment notes from multiple providers consistently noted Plaintiff was cooperative. (*Id.* at PageID.506, 507, 508, 509, 510, 511, 520, 546-47, 563, 570, 573, 577, 582, 586, 590).

The ALJ's analysis on this topic is somewhat sparse after step three, but he did explain: "The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (*Id.* at PageID.52). Specifically, Plaintiff "is apparently able to care for children at home, without any particular assistance, which can be quite demanding both physically and emotionally." (*Id.*). Considered with the ALJ's note at Step Three that Plaintiff spends time with others and can go out alone, (*id.* at PageID.46), and the survey of the record above, I suggest substantial evidence supports the ALJ's decision not to restrict Plaintiff's contact with others. And if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Thus, I would say the ALJ's decision not to include social limitations in the RFC is supported by substantial evidence, and would not suggest remand on this basis.

Moving on to a related issue: Plaintiff suggests the ALJ flouted the treating source rule by giving only partial weight to the opinion of Dr. Tejero. Under the treating-source

rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. Here, the ALJ gave partial weight to Dr. Tejero, noting that he had opined Plaintiff's mental impairments had not lasted or were not expected to last at least 12 months. (R. 9 at PageID.51) (citing *id.* at PageID.755). The ALJ found that his "functional analysis supports the claimant's ability to work, and nothing in his notes supports an inability to interact with others in the workplace." (*Id.*).

In reality, Plaintiff says, Dr. Tejero's findings were supported by his own notes of social isolation, (R. 13 at PageID.865) (citing R. 9 at PageID.533 (Plaintiff reports social isolation)), and a lack of social support, (*id.*) (citing R. 9 at PageID.591 (noting "[l]ack of social support" as a risk factor), as well as a transcribed comment from Plaintiff that she had "always been a people person so it is hard being around a lot of people now," (*id.*) (referring to R. 9 at PageID.562). In addition, Plaintiff says, Dr. Tejero's findings were in line with Bishop's findings that Plaintiff would be seriously limited in her ability to work in coordination with or proximity to others and to interact with the general public, and limited in her ability to get along with co-workers or peers. (R. 13 at PageID.865) (citing R. 9 at PageID.774-75). And as Plaintiff sees it, Bishop's treatment notes indicate "social isolation" was an ongoing problem, (R. 13 at PageID.865-66) (citing R. 9 at PageID.764, 766, 777, 778), and "reflect Plaintiff's unease at being in public places," (*id.* at PageID.865) (presumably referring to R. 9 at PageID.769).

Defendant, however, points out that Dr. Tejero indicated Plaintiff's impairments had not lasted or were not expected to last at least 12 months, (R. 14 at PageID.882) (referring to R.9 PageID.755), and thus his opinion does little to help Plaintiff. *See* 20 C.F.R. §§ 404.1509, 404.1522(b) (impairment must remain disabling for at least 12 consecutive months); *see also Sharp v. Barnhart*, 152 F. App'x 503, 508 (6th Cir. 2005) (opinion that does not satisfy durational requirement cannot lead to finding of disability).

Plaintiff retorts that Dr. Tejero "obviously 'misspoke,' since he had already treated plaintiff for her mental impairment for more than a year at the time of his statement." (R. 16 at PageID.899). I take Plaintiff's point, but do not agree it is necessarily "obvious" that Dr. Tejero made an error. Yes, Dr. Tejero had been seeing her for a year—almost to the day, in fact. (R. 9 at PageID.568 (first appointment with Dr. Tejero on June 14, 2016), 752 (mental RFC questionnaire completed by Dr. Tejero on June 16, 2017)). But it is difficult to glean much intent from a single checked box. Perhaps Dr. Tejero had seen or anticipated significant improvement in Plaintiff's mental health. He left the section for a prognosis blank. (*Id.* at PageID.758). He noted that her symptoms were "stabilizing on medications." (*Id.*). And he did not find her unable to meet competitive standards in any ability needed to do unskilled, semiskilled, or skilled work. (*Id.* at PageID.760).

At Plaintiff's March 31, 2017 appointment with Dr. Tejero, the closest in time to his June 2017 RFC statement, Plaintiff told Dr. Tejero that she had noticed "a little improvement" in her anger, and had not been irritated as easily. (R. 9 at PageID.572). She was still not sleeping well, but managed to get four hours of a sleep a night. (*Id.*). Her depression was under good control, her hair pulling had lessened, and her anxiety was

29

minimal. (*Id.*). She was no longer hearing voices. (*Id.*). Her speech was spontaneous and normal in rate, rhythm, volume, and amount. (*Id.* at PageID.573). She was cooperative and had fair eye contact. (*Id.*). Her affect was euthymic, with a full range, and she displayed logical thought processes and partial insight and judgment. (*Id.* at PageID.574).

And at Plaintiff's annual review[6], about a month before Dr. Tejero completed his RFC statement, Plaintiff said she was doing somewhat better than a year ago; her hair pulling was not as frequent, and her depression was "under fair control." (*Id.* at PageID.561). Though her sleep remained an issue, she was getting more than before. (*Id.* at PageID.561, 563). She was cooperative, her speech was normal in rate and volume, her thought content was unremarkable, and her judgment and impulse control were "fair/good." (*Id.* at PageID.563).

Thus, I would decline Plaintiff's request to read Dr. Tejero's statement against its plain meaning; if the ALJ erred by not affording it more weight, I do not see how that error could have harmed Plaintiff, since the opinion was not particularly favorable.

### ii.   Plaintiff's Expected Absences from Work

Second, Plaintiff says the ALJ erred by not accounting for Plaintiff to miss multiple days of work per month—which would be work-preclusive—considering that Dr. Tejero indicated she would miss two days of work a month, (R. 9 at PageID.755), which Bishop reported Plaintiff would miss four, (*id.* at PageID.775). (R. 13 at PageID.868). The ALJ

---

[6] Although Plaintiff's annual review was about her treatment with Dr. Tejero, the review itself seems to have been conducted not by Dr. Tejero, but by Jeff Riggs. (*Id.* at PageID.561).

30

gave little weight to Ms. Bishop's opinion because "her limitations were considerably more limiting than Dr. Tejoro's [*sic*], and are not supported by reported behaviors in the progress notes." (R. 9 at PageID.51). Plaintiff protests that "even Dr. Tejero's opinion . . . would be work-preclusive," and "[t]he ALJ did not resolve this issue." (R. 13 at PageID.868).

In response, Defendant repeats that Dr. Tejero's opinion does not prove disability because it said Plaintiff's impairments had not lasted or were not expected to last 12 months. (R. 14 at PageID.885) (citing R. 9 at PageID.755). And the ALJ "was justified in discounting Ms. Bishop's opinion as the opinion of a non-acceptable medical source that did not square with the opinion of Dr. Tejero, an acceptable medical source"—a finding Plaintiff does not challenge. (*Id.* at PageID.885-86). *See* SSR 06-03p, 2006 WL 2329939, at *5. For the same reasons as above, I would not assume Dr. Tejero made a mistake when he marked that Plaintiff's impairments had not last or could not be expected to last 12 months, and thus, the ALJ did not err by not accounting for Plaintiff's predicted absences.

### iii.    Plaintiff's Left Ankle Impairment

Third, Plaintiff takes issue with the ALJ's treatment of her ankle impairment. First, Plaintiff observes that the ALJ found "[t]ibial tendinitis" to be a severe impairment, but "left posterior tibial tendinitis/synovitis" to be non-severe, (R. 9 at PageID.44), and the doctor who performed surgery on her ankle in July 2016 diagnosed "left ankle synovitis and instability," (*id.* at PageID.821). Plaintiff does not describe any actual harm caused by the confusion, though she expresses that "[t]his uncertainty certainly clouds the ALJ's analysis." (R. 13 at PageID.869). I would find harmless any error in the seeming contradiction between tibial tendinitis being a severe impairment and left posterior tibial

tendinitis being non-severe, because the ALJ must consider both severe and non-severe impairments in crafting a claimant's RFC. *See Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 802, 803 (6th Cir. 2003) (holding that where the ALJ found a severe impairment at Step Two, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence"); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (finding it was harmless error for the ALJ to classify impairment as non-severe where the analysis moved past step two, because the ALJ must consider both severe and non-severe impairments in determining RFC).

Putting aside the confusion at step two, Plaintiff suggests that the ALJ erred by not accounting for her ankle injury, and instead relied too heavily on Dr. Moore's post-surgery remark that her ankle was no longer unstable. (R. 13 at PageID.839). Dr. Moore "still diagnosed persistent left ankle pain and synovitis when he saw plaintiff in January 2017, nearly six months after the surgery." (R. 13 at PageID.869-70) (citing R. 9 at PageID.817). Plaintiff does not specifically state what limitations her ankle necessitates, but she implies some limitation on standing or walking would be appropriate. (R. 13 at PageID.870).

Plaintiff bears the burden of proving her disability, including her RFC limitations. *Jordan*, 548 F.3d at 423 (claimant bears burden of demonstrating need for more restrictive RFC); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has the ultimate burden of establishing the existence of disability."). Defendant maintains that Plaintiff has failed to carry that burden, because she presented to no evidence establishing specific RFC limitations based on her ankle. (R. 14 at PageID.887). The diagnosis of "[p]ersistent left ankle synovitis and pain," alone, is not enough: "The mere

diagnosis . . . says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). And in that same note, Dr. Moore said Plaintiff's ankle "is not unstable anymore," that she "still has a little bit of flat foot and therapy really helps," and that she had only "mild" tenderness in the ankle. (R. 14 at PageID.887) (citing R. 9 at PageID.817).

Also relevant is Dr. Jackson's opinion, as Dr. Jackson completed the only physical RFC assessment in the record, making it the "best evidence" on Plaintiff's physical limitations. (R. 14 at PageID.888) (citing *Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 294 (6th Cir. 2006)); *see also Hunter ex rel. Hunter v. Sec'y of Health & Human Servs.*, No. 94-5383, 1995 WL 149105, at *1 (6th Cir. Apr. 4, 1995); *Pickell v. Comm'r of Soc. Sec.*, No. 14-cv-12824, 2015 WL 5138741, at *6 (E.D. Mich. Sept. 1, 2015) (where the record contains no detailed functional assessment from claimant's treating physicians, the assessment from the reviewing state agency physician "remains important evidence upon which the ALJ was entitled to rely"); *Kimbrough v. Comm'r of Soc. Sec.*, No. 09-13259, 2010 WL 3862710, at *7 (E.D. Mich. Aug. 19, 2010) (where there were no treating source opinions, the ALJ properly relied on the opinions of the state agency examiners).

Dr. Jackson did conclude Plaintiff could do medium work, but he also assessed additional limitations—namely, that she could frequently push and pull with her lower left extremity; occasionally climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; and frequently stoop, crouch, and kneel. (R. 9 at PageID.109-10). Defendant admits that "[o]rdinarily, this would be a problem," but says all is well here because the ALJ asked the VE a hypothetical that included all of Dr. Jackson's assessed restrictions,

and the VE testified the same jobs would remain available. (R. 14 at PageID.888) (citing R. 9 at PageID.92-93).

But there is a complication. As Plaintiff points out, the ALJ gave only partial weight to Dr. Jackson's physical RFC assessment, because "additional records show[] the claimant's joint dysfunction support [*sic*] *greater* limitations." (R. 9 at PageID.51) (emphasis added). Yet the RFC did not include even Dr. Jackson's recommended limitation to frequent pushing and pulling with the left lower extremity, let alone *greater* limitations. Nor did the ALJ leave any clues as to what greater limitations he was imagining. In fact, the ALJ did not add *any* limitations to account for Plaintiff's joint dysfunction.

Defendant reiterates that "any error in the ALJ's analysis of Dr. Jackson's opinion is harmless," because "the ALJ asked the VE a hypothetical that included all the RFC restrictions Dr. Jackson assessed, and the VE said work was available despite those limitations." (R. 14 at PageID.890) (citing R. 9 at PageID.92-93). That answer serves Defendant less well here. The ALJ explicitly stated the record justified *greater* limitations than those assessed by Dr. Jackson. (R. 9 at PageID.51). Nor is Defendant saved by the VE's testimony that additional restrictions to light or sedentary work would not preclude employment, (R. 9 at PageID.94-96), since the ALJ's opinion offers no clues as to what greater restriction he thought necessary to account for Plaintiff's joint dysfunction.

Social Security Ruling 96-6p emphasizes that "[f]indings of fact made by State agency medical and psychological consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining

34

sources" at the ALJ level. SSR 96-6p, 1996 WL 374180, at *1 (S.S.A. July 2, 1996).[7] ALJs "may not ignore these opinions and must explain the weight given to these opinions on their decisions." *Id*. Though the ALJ did not ignore Dr. Jackson's opinion, I find the ALJ's attempted explanation here unsatisfactory in light of the contradictory RFC. I suggest the court remand this case for the ALJ to resolve the above contradictions and account for Plaintiff's left ankle impairment as necessary, explaining his reasoning.

### H. Conclusion

For the reasons stated above, I suggest that substantial evidence does not support the Commissioner's decision, and I therefore **RECOMMEND** that Plaintiff's Motion for Summary Judgment, (R. 14), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (R. 16), be **DENIED** and this case be **REMANDED** for further proceedings.

### III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some

---

[7] SSR 96-6p was rescinded and replaced by SSR 17-2p effective March 27, 2017; I refer to SSR 96-6p because it was still in effect at the time Plaintiff filed her benefits claim.

objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: July 29, 2019

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 29, 2019

By s/Kristen Castaneda
Case Manager

36